CITY OF SPRINGFIELD, APPELLEE, *v.* MYERS, APPELLANT.

22

(No. CA 2420—Decided
June 2, 1988.)

*Kurt Hasselbach,* city prosecutor, for appellee.

*Paul Moke* and *Stan Laughlin, Jr.,* for appellant.

*Per Curiam.* Defendant-appellant Walter Myers was summoned before the Honorable Eugene S. Nevius, a Judge of the Springfield Municipal Court, to show cause why he should not be held in contempt. In the course of that hearing, Myers was found to have been in direct contempt of the court, and was ordered incarcerated for a period of ten days. From that judgment, Myers appeals.

Although we agree with Myers that under the totality of the circumstances in this case the contempt proceedings against Myers were so fundamentally unfair as to violate his right to due process of law under the Fourteenth Amendment to the United States Constitution, we conclude that this case is moot as a result of Myers' having completed his sentence for contempt. Therefore, this appeal will be dismissed.

I

Myers was found guilty in the Springfield Municipal Court of disorderly conduct. Judge Nevius presided at his trial and sentenced him to thirty days' incarceration. While incarcerated, Myers telephoned a local radio call-in show. Evidently, at some point during the telephone call, a conversation between Myers and the talk-show host was broadcast on the radio. During the course of this conversation, Myers evidently referred to himself as a "political prisoner" and referred to Judge Nevius as a "nitwit." While it appears that a tape recording of at least the broadcast portion of this conversation was played at some point during the contempt hearing, it is not of record in this appeal. It does not appear to be disputed, however, that Myers referred to himself as a "political prisoner" and that he referred to Judge Nevius, at least once, as a "nitwit."

On October 6, 1987, one week after the broadcast, Judge Nevius ordered Myers to appear before him and to show cause why he should not be held in contempt. The complete text of this order to show cause is as follows:

"Please be advised that you are hereby ordered to appear in Courtroom #1 at 9:00 a.m. October 7, 1987 to show cause as to why you should not be held in contempt of this Court. The specific grounds of contempt include certain remarks made by the accused over the radio airwaves of Station WBLY on Tuesday, September 29, 1987, between the hours of 8:00 a.m. and 9:00 a.m. Said remarks were directed against the dignity and authority of the Court and occurred in the presence of or so near the Court or Judge as to obstruct the administration of justice.

"IT IS SO ORDERED."

Myers appeared as ordered, but at the hearing on October 7, it became clear that Myers wished to be represented by counsel. Accordingly, Judge Nevius continued the hearing until the following day, for the purpose of giving Myers an opportunity to obtain counsel. It appears that Myers was, at the time, incarcerated on the disorderly conduct charge.

The next day, Myers again appeared before Judge Nevius. Preliminarily, Myers explained that he had not been able to obtain counsel because his jailers would not let him make long-distance telephone calls, and he desired to seek counsel in Columbus to represent him. Judge Nevius brushed aside this explanation. We cannot determine from the transcript whether Judge Nevius simply did not believe Myers, or whether he felt that Myers had been accorded an adequate opportunity to obtain counsel. In any event, Judge Nevius proceeded with the hearing.

Myers was equally unsuccessful in asserting his right to an explanation as to the exact conduct alleged to have been contemptuous, and in asserting his privilege against self-incrimination. Judge Nevius brushed aside the former with an explanation that it was for Myers to answer the judge's questions, not the other way around; Judge Nevius brushed aside Myers' attempted invocation of his privilege against self-incrimination without explanation.

Toward the end of the hearing, Judge Nevius, by his questioning, appeared to accept Myers' characterization of his remarks broadcast on the radio as merely an expression of opinion, entitled to protection under the First Amendment to the United States Constitution, and Section 11, Article I of the Ohio Constitution. However, Judge Nevius found Myers to be in direct contempt as a result of his conduct during the contempt hearing itself. Apparently, this was based upon Myers' having asserted, at one point during the hearing, in mitigation or excuse of his conduct during the radio broadcast, that he did not know, at the time he made those remarks, that they were being broadcast. Judge Nevius evidently found that Myers was lying during the hearing when he asserted that he did not know, at the time he made the remarks, that they were being broadcast. Based on Myers' conduct during the contempt hearing itself, Judge Nevius found Myers to be in direct contempt and ordered him incarcerated for ten days. From that judgment, Myers appeals.

II

Myers has four assignments of error as follows:

First Assignment of Error

"The trial court punished appellant for criticizing the court on a radio call-in show by issuing a show cause order and by sentencing appellant to ten days in jail thereon, despite the fact that such statements represented speech protected by the First Amendment."

24

### Second Assignment of Error

"The trial court failed to disqualify itself from hearing the instant case after acquiring a direct, personal, and substantial interest in reaching a conclusion against the appellant, thereby violating appellant's due process rights."

### Third Assignment of Error

"The trial court failed to afford the appellant a reasonable opportunity to obtain counsel and coerced appellant into appearing *pro se* at a contempt hearing that resulted in appellant's incarceration."

### Fourth Assignment of Error

"The trial court forced the appellant to answer questions that were intended to and did elicit self-incriminatory testimony in violation of appellant's Fifth and Fourteenth Amendment rights."

Myers' first assignment of error is somewhat wide of the mark, since it is evident that Judge Nevius did not hold Myers in contempt for the remarks broadcast on the radio, even though that was the ostensible purpose of the contempt hearing. Rather than treating Myers' assignments of error separately, we shall consider them together, in determining whether the totality of circumstances resulted in Myers' having been deprived of his liberty without due process of law, in violation of the Fourteenth Amendment.

We agree with Myers' assertion that his characterizing himself as a "political prisoner" and characterizing Judge Nevius as a "nitwit" were expressions of opinion and, as such, constitutionally protected free speech. Judicial officers, like all other public officers, are subject to public criticism and, as long as that criticism is merely the expression of opinion, not involving deliberate or reckless misstatements of fact, it is entitled to the absolute protection afforded by both the Ohio and the United States Constitutions. It would seem from his remarks during the hearing that Judge Nevius understood that Myers could not possibly have been held in contempt as a result of his mere expression of opinion during the radio broadcast.

From our review of the transcript, it appears that the purpose of the contempt hearing, which was ostensibly to give Myers the opportunity to show cause why he should not be punished for contempt on account of the remarks he made during the radio broadcast, may really have been in the nature of an inquisition during which Myers, an abrasive person, could be expected to do or say something that would properly be deemed to be in direct contempt. Thus, Judge Nevius seized upon Myers' explanation that he did not realize that he was on the air when he made the remark, an explanation obviously intended to mollify the judge, and concluded, based upon the judge's review of the tape made of the broadcast, that Myers had indicated, during the broadcast, that he realized that he was on the air, and that Myers could not possibly have forgotten that, so that he was lying when he offered the explanation that he had not realized that his remarks were being broadcast. The judge seized upon that opportunity to hold Myers in direct contempt for his remarks made during the contempt hearing, itself.

In this connection, it is significant that Myers had been given short shrift in his efforts to obtain counsel for the contempt hearing, and also that his attempted invocations of his Fifth Amendment privilege against self-incrimination were ignored. The purpose of the privilege against self-incrimination is to avoid putting a criminal defendant into the position of either having to incriminate himself, or

having to lie in excuse or mitigation of his conduct, and thereby expose himself to prosecution for perjury. The privilege against self-incrimination affords him a way out of this dilemma by simply declining to testify at all. While we cannot condone lying under oath, it would seem that Myers was unfairly placed in the very dilemma that the privilege against self-incrimination was designed to avoid, when Judge Nevius brushed aside Myers' attempted invocations of his privilege against self-incrimination. Myers was confronted with a trial judge who had initiated contempt proceedings based on the remarks that Myers had made during a radio broadcast. He had not been able to obtain counsel to advise him. While we cannot condone his having lied about not being aware that his remarks were being broadcast (assuming, for purposes of discussion, that that was a knowing lie on Myers' part), we conclude that the totality of circumstances was so fundamentally unfair as to deprive Myers of constitutional due process.

In this regard, it is interesting to note that the trial judge, in response to Myers' request that the tape of the broadcast be played to refresh his memory as to what he said, responded as follows: "If I had it, I suppose I could, but my question for you is whether you made that comment or not." Thus, the trial judge clearly implied that he did not have the tape.

Later, after Myers testified that he could not recall having used the word "nitwit" in reference to Judge Nevius, Judge Nevius said: "All right. Let's bring in the tape player and we'll play the tape for you, Mr. Myers, and help your recollection, how would that be."

The transcript reflects that after a recess, the tape was played. The foregoing would suggest that in the emotionally charged contest of wills that the contempt hearing had become,

even the trial judge had difficulty maintaining that perfect devotion to truthfulness that should, ideally, characterize judicial proceedings.

Our review of the transcript in this case leads us to the conclusion that the trial judge, angered at having been called a "nitwit" over the radio, summoned Myers before him on a contempt charge that clearly had no proper basis, in the hope that Myers would do or say something during the contempt hearing that would expose him to punishment for a direct contempt. This conclusion is bolstered by the trial court's having rejected Myers' invocation of his privilege against self-incrimination during the course of the hearing.

Under the totality of circumstances in this case, we conclude that the course of proceedings wherein Myers was held in contempt was so fundamentally unfair as to violate his right to due process of law under the Fourteenth Amendment to the United States Constitution.

Unfortunately for Myers, we cannot reverse his conviction for contempt because that issue is now moot. Myers has already served his time. Although there seems to be a modern trend toward liberalizing the traditional rules of mootness in recognition of the serious stigma attendant upon even a misdemeanor criminal conviction,[1] Ohio, even in a recent case decided by the Ohio Supreme Court, adheres faithfully to the traditional rules. The Ohio Supreme Court has held that "[w]here a defendant, convicted of a criminal offense, has voluntarily paid the fine or completed the sentence for that offense, an appeal is moot when no evidence is offered from which an inference can be drawn that the defen-

_____

[1] See Annotation (1966), 9 A.L.R. 3d 462, 466, fn. 3.

dant will suffer some collateral disability or loss of civil rights from such judgment or conviction." *State* v. *Wilson* (1975), 41 Ohio St. 2d 236, 70 O.O. 2d 431, 325 N.E. 2d 236, syllabus. The burden of proof is on the defendant to establish at least an inference that he will suffer some collateral disability or loss of civil rights. *State* v. *Berndt* (1987), 29 Ohio St. 3d 3, 29 OBR 173, 504 N.E. 2d 712; *State* v. *Wilson, supra.* There is nothing in the record to suggest that Myers will suffer any collateral disability or loss of civil rights. Accordingly, we conclude that the issues raised in this appeal are moot.

This appeal is dismissed as moot.

*Appeal dismissed.*

WILSON, BROGAN and FAIN, JJ., concur.